IRVING, J.,
for the Court.
¶ 1. A Monroe County jury convicted Bobby Herron of murder, and the circuit court sentenced him to life in the custody of the Mississippi Department of Corrections. Aggrieved, Herron appeals and alleges the following errors: (1) whether the trial judge abused his discretion in failing to grant a mistrial when it was discovered that a juror knew a witness that was scheduled to testify, (2) whether the trial court erred in failing to grant a directed verdict in his favor at the close of the State’s case-in-chief, and (3) whether the trial court erred in failing to grant a judgment notwithstanding the verdict or a new trial.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. In the case sub judice, the only undisputed fact is that Sterlyn Fields was shot in the back of the head with a sixteen gauge shotgun while at the home of Bobby Herron, in Nettleton. As to the remaining facts, both the prosecution and Herron gave varying accounts of the events which led to Fields’s death and Herron’s arrest for his murder.
¶ 4. According to the prosecution, Her-ron was upset about his battery having been stolen from his truck some days before the shooting. Herron apparently received information from some source that Fields was the person who had stolen his battery. Acting on this information, Her-ron accosted Fields at a nearby business, dragged Fields back to his home, and shot Fields in the back of the head while Fields begged for his life. After shooting Fields, Herron got into his truck and drove to the police station and informed the police of the crime that he had committed.
¶ 5. At trial, Eddie Reed, a police officer with the Nettleton Police Department, testified that he was working out in the gym behind the police station when Herron came to him and admitted “that he had shot Sterlyn Fields in the back of the head with a 16-gauge shotgun, [and] he was *836 lying dead in his yard.” Reed further testified that, four days before the shooting, when he was investigating and filling out a report on Herron’s stolen battery, Herron told him “that if he found out, you know, who stole his truck battery that I wouldn’t have to worry about them anymore.”
¶ 6. Chris Patterson, a police officer with the Nettleton Police Department, was dispatched to the scene of the crime. He testified that, upon arrival at the scene, he found Fields in Herron’s yard, lying on his stomach with a large hole in his head and barely breathing. Patterson also stated that he discovered brain matter and parts of Fields’s hand on Herron’s carport. Patterson further testified that he later discovered the murder weapon behind the seat of Herron’s truck.
¶ 7. Thomas Adams, then acting chief of the Nettleton Police Department, testified that when he arrived at the scene, he noticed that Fields had a large hole in the left backside of his head and “half his hand was gone.” Adams also testified that, while at the scene, Steve Orr, a cousin of Fields, told him that Orr saw the entire incident and “saw Bobby shoot Sterlyn in cold blood.”
¶ 8. Steve Orr testified that he witnessed the entire incident which transpired between Herron and Fields. According to Orr, Herron approached Fields outside the business, accused him of stealing his battery, said that he was going to kill Fields for stealing his battery, grabbed Fields and began dragging him down the street toward Herron’s house. Orr stated that he followed behind the two men from a distance until they reached Herron’s house. Orr testified that, as he came around the corner of Herron’s house, he saw Fields on his knees with Herron eight to ten feet away holding a shotgun. Orr stated that Fields begged for his life, saying, “Mister, I ain’t done nothing to you, please don’t shoot me.” Orr further stated that he also pleaded with Herron, but Her-ron still pulled the trigger.
¶ 9. Anthony Walker lived three houses from Herron. He testified that he witnessed everything except the shooting, which he only heard. Walker stated that he saw Herron dragging ■ Fields toward Herron’s house. Walker also stated that he heard Herron tell Fields that he was going to kill him because he had stolen his truck battery. Walker further stated that he heard Orr tell Herron, “Bobby, don’t shoot him. You don’t have to shoot him.”
¶ 10. Doctor Steven Hayne, the forensic pathologist who performed the autopsy on Fields’s body, testified that Fields died from a gunshot wound to the back left side of the head. Dr. Hayne gave his expert opinion that the muzzle of the murder weapon was at least two feet away from the victim’s head and hands, that the victim’s hands were up around his head in a defensive posture, and that there was no gunshot residue on the victim’s hands. Dr. Hayne found the wounds to be consistent with Fields being on his knees with the shooter behind him and to his left, shooting downward.
¶ 11. Herron took the stand and testified in his own defense. He testified that he was on his way to get something to eat when Fields approached him and asked for money to buy alcohol. According to Her-ron, at that same time, Orr also approached him and began acting aggressively. Fearing for his safety, Herron stated that he ran back to his house. Herron testified that, once home, he heard a noise and went outside, where he found Fields and Orr rummaging through his truck. Herron testified that he went inside and got his shotgun, hoping that the sight of it would scare the two men into leaving. Herron further testified that after he came *837 back outside with his shotgun, he told the two men to get off his property. According to Herron, Orr complied and left, but Fields refused to leave and started coming toward him. Herron testified that once Fields got close enough to him, he grabbed the shotgun, causing a struggle over it. Herron went on to state that during the struggle, Fields slipped, twisted as he was falling, and was accidentally shot in back of the head as the gun went off.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Motion for a Mistrial

¶ 12. Herron argues that the court should have declared a mistrial when it was discovered, during the course of the trial, that one of the selected jurors knew Adams. Herron contends that during voir dire by the court, the juror should have informed the judge of his relationship with Adams when the court read the potential witness list.[1] Herron maintains that the failure of the juror to inform the court of his acquaintance with Adams amounted to prejudice to him in selecting a jury. We note that, contrary to what Herron intimates in his brief, the court never asked members of the venire if they knew any of the potential witnesses. In conducting voir dire, the court stated:
Now, some of you may know one or all of these people, but that’s not really the question. The question is whether your knowledge of them would tend to make their testimony more believable or less believable or would influence you somewhat. If that’s the case, I need to know it at this time.
(emphasis added).
¶ 13. “Whether to grant a motion for a mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion.” Pulphus v. State, 782 So.2d 1220, 1223(¶ 10) (Miss.2001). “The failure of the court to grant a motion for a mistrial will not be overturned on appeal unless the trial court abused its discretion.” Bass v. State, 597 So.2d 182, 191 (Miss.1992).
¶ 14. In overruling Herron’s motion for a mistrial, the court stated:
the jurors were thoroughly voir dired by the Court, and the Court explained to them, upon reading this list of potential witnesses to be offered on behalf of the State and the defense — the jury panel was questioned and informed by the Court that the issue was not whether or. not they simply knew someone who might be a witness for either side, but whether that knowledge would have any bearing on them or influence on them, one way or the other, for or against either party if chosen.... The test is not whether or not they know someone, but it’s whether or not they would be influenced one way or another by that person’s testimony. And the fact that you attend church with someone is not an automatic exclusion either.
We agree with the court. Here, the court was satisfied that the members of the veni-re could be fair and impartial if chosen to serve on the jury, regardless of any association or acquaintances with potential witnesses. Based on these facts, we cannot find that the lower court abused its discretion in denying the motion for a mistrial.
¶ 15. Furthermore, we agree with the court’s statement that: “Just because the court asked the questions that it did, that *838 certainly did not preclude the State nor the defense from following up with any other questions regarding potential relationships that may — that the members of the jury panel might have with any witnesses.” The prejudice that Herron now claims he suffered could have been avoided had his attorney followed up the court’s voir dire with his own voir dire into relationships between the jury panel and potential witnesses. Therefore, we decline to hold the trial court in error.
2. Posttrial Motions
¶ 16. Herron first contends that the trial court erred in denying his motion for a directed verdict at the close of the State’s case-in-chief. It is a well settled principle of Mississippi law that “when the defendant proceeds with his case after the State rests and the court overrules the defendant’s motion for a directed verdict, the defendant has waived the appeal of that directed verdict.” Shelton v. State, 853 So.2d 1171, 1186(¶ 49) (Miss.2003) (citing Holland v. State, 656 So.2d 1192, 1197 (Miss.1995)). Therefore, Herron effectively waived his motion for a directed verdict when the trial court denied the motion and he proceeded with his case. Consequently, this issue is proeedurally barred.
¶ 17. Herron next argues about the sufficiency and weight of the evidence. In doing so, he combines his arguments regarding the sufficiency of the evidence with his arguments regarding the weight of the evidence. We address them separately below.

(a) Weight of the Evidence

¶ 18. Herron argues that the trial court erred in denying his motion for a new trial. Motions for a new trial challenge the weight of the evidence. “When reviewing a denial for a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005) (quoting Herring v. State, 691 So.2d 948, 957 (Miss.1997)). “However, the evidence should be weighed in the light most favorable to the verdict.” Id. It is within the discretion of the court whether to grant a new trial, and this discretion should be exercised “only in exceptional cases in which the evidence preponderates heavily against the verdict.” Id. (quoting Amiker v. Drugs for Less, Inc., 796 So.2d 942, 947(¶ 18) (Miss.2000)).
¶ 19. Despite Herron’s assertion that Fields was accidentally shot in the back of the head while the two wrestled over the gun, we cannot view the evidence in the light most favorable to the verdict and say that an unconscionable injustice resulted from the jury’s verdict. Officer Reed testified that Herron came to him and told him that he had shot Fields in the back of the head and that Fields was lying dead in his yard. Officer Patterson and Adams testified that they arrived at Herron’s house to find Fields’s lying face down in the yard with a gunshot wound to the back of the head. Orr, who was an eyewitness to the incident, testified that he saw Her-ron shoot Fields without justification. Walker’s testimony corroborated Orr’s testimony about events that transpired between Herron and Fields before Fields was fatally shot. The forensic evidence indicated that the shooting was not accidental.
¶ 20. We cannot say that allowing the verdict to stand would sanction an unconscionable injustice. Therefore, the trial court did not abuse its discretion in denying a new trial. This allegation of error is without merit.

*839
(b) Sufficiency of the Evidence

¶ 21. Herron contends that the trial court erred in denying his motion for a judgment notwithstanding the verdict. A motion for a judgment notwithstanding the verdict challenges the legal sufficiency of the evidence presented at trial. The Mississippi Supreme Court has stated:
that in considering whether the evidence is sufficient to sustain a conviction in the face of a motion for a directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the. evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ However, this inquiry does not require a court to ‘ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.’ Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
Dilworth v. State, 909 So.2d 731, 736(¶ 17) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
¶22. Considering the evidence in the light most favorable to the prosecution, we find that there was sufficient evidence for a reasonable jury to find that Herron committed the crime of murder. The prosecution produced an eyewitness to the murder, in addition to another witness who heard Herron state that he was going to kill Fields for stealing his battery. More importantly, Officer Reed testified that Herron admitted to him that he had shot and killed Fields. Although Herron testified that the shooting was accidental and done in self-defense, Orr contradicted Her-ron’s testimony by testifying that he witnessed Herron shoot Fields in the back of the head while Fields was on his knees begging for his life. Dr. Hayne testified that it was highly unlikely that Fields was shot in the manner that Herron described and that Orr’s version of the shooting was more consistent with the forensic evidence. Therefore, the evidence presented was sufficient to support a conviction. Herron’s assertion of error is without merit.
¶ 23. THE JUDGMENT OF THE CIRCUIT COURT OF MONROE COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MONROE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. ■

. During a break, a bailiff informed the court that a juror had told him that he knew Adams because they attended the same church.